# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| VICTORIA ALZZA,<br><br>　　　　　　*Plaintiff,*<br><br><br>　　　v.<br><br><br>PRUDENTIAL INSURANCE COMPANY OF AMERICA,<br><br>　　　　　　*Defendant.* | Civil Action No. 15-5194 (JMV)<br><br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

　　This case arises from Plaintiff Victoria Alzza's ("Plaintiff" or "Alzza") claim for long-term disability benefits and Defendant Prudential Insurance Company of America's ("Defendant" or "Prudential") denial of her claim. Plaintiff challenges Defendant's determination under the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 502(a) *et seq.* ("ERISA"). This matter comes before the Court by way of Plaintiff's motion for summary judgment (D.E. 32) and Defendant's cross-motion for summary judgment (D.E. 33). Both motions are pursuant to Federal Rule of Civil Procedure 56. The Court reviewed all submissions made in support and in opposition to the motions,[1] and considered the motions without oral argument

---

[1] In this Opinion, Plaintiff's Complaint (D.E. 1) will be referred to as "Compl." Plaintiff's brief in support of her motion for summary judgment (D.E. 32) will be referred to as "Pl. Br." Defendant's brief in opposition (D.E. 37) will be referred to as "Def. Opp. Br." Plaintiff's reply brief (D.E. 39) will be referred to as "Pl. Reply." Defendant's brief in support of its motion for summary judgment (D.E. 33) will be referred to as "Def. Br." Plaintiff's brief in opposition

pursuant to L. Civ. R. 78.1(b). For the reasons stated below, Plaintiff's motion is **DENIED** and Defendant's cross-motion is **GRANTED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

Alzza began working for Barnabas Health Inc. ("Barnabas") at Monmouth Medical Center on June 1, 2009 as an operating room nurse. PRU 004, 212. Defendant issued to Barnabas a group insurance policy, the Barnabas Health Long Term Disability Insurance Plan (the "Plan"). PRU 283-465. The Plan qualified as an ERISA employee welfare benefit plan. Under the Plan, benefits were provided by Defendant, while Barnabas is the plan sponsor and plan administrator. PRU 359; DSOMF ¶ 4. Plaintiff was enrolled in the Plan.

The parties dispute which documents constitute the Plan. The three relevant documents are (1) the group insurance contract between Prudential and Barnabas (the "Group Contract"), (2) the Saint Barnabas Health Care Systems ("SBHCS") Benefit Program Summary Plan Description (the "Employer Plan Document"), and (3) a booklet/certificate prepared by Prudential in connection with the Plan (the "Booklet"). PRU 283-598.

The Group Contract

The Group Contract, PRU 283-315, provides the Plan's general rules, plan schedules, and amendments to the Plan.

---

(D.E. 36) will be referred to as "Pl. Opp. Br." Defendant's reply brief (D.E. 38) will be referred to as "Def. Reply."

[2] The Court cites directly to the administrative record (marked as PRU 077212-000881-000001, *et seq.*), which was attached as Exhibit A to Plaintiff's motion for summary judgment (D.E. 32) and attached as Exhibit A to the Declaration of Robert T. Szyba in support of Defendant's cross-motion for summary judgment (D.E. 33). The Court refers to the administrative record by the last three digits (e.g. PRU 077212-000881-000001 will be referred to as "PRU 001").

## The Booklet

The Booklet, PRU 316-357, expands on the basic provisions of the Group Contract. The Booklet states, in part, as follows:

> You are disabled when Prudential determines that:
> - you are unable to perform the material and substantial duties of your regular occupation due to sickness or injury;
> - you are under the regular care of a doctor; and
> - you have a 20% or more loss in your monthly earnings due to the sickness or injury. . . .
>
> Prudential will assess your ability to work and the extent to which you are able to work by considering the facts and opinions from:
> - your doctors; and
> - doctors, other medical practitioners or vocational experts of our choice.
>
> Material and substantial duties means duties that:
> - are normally required for the performance of your regular occupation; and
> - cannot be reasonably omitted or modified.
>
> Regular occupation means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.
>
> Sickness means any disorder of your body or mind, but not an injury; pregnancy including abortion, miscarriage or childbirth. It includes an elective treatment or procedure that is not medically necessary. Disability must begin while you are covered under the plan.

PRU 330. The Booklet also describes the scope of its coverage of mental illness:

> The Disabilities, which, as determined by Prudential, are due in whole or part mental illness have a limited pay period during your lifetime.
>
> The limited pay period for mental illness is 24 months during your lifetime.

3

PRU 338. The Certificate/Booklet further provides definitions for "injury," "regular care," "doctor," "monthly earnings," and "elimination period." PRU 330-331.

The Employer Plan Document

The Booklet also includes the 2011 Employer Plan Document. The parties debate the significance of the Employer Plan Document.[3] PRU 466-598. The Booklet expressly states that "[T]he [Employer Plan Document] is *not part* of the Group Insurance Certificate. It has been provided by your Employer and included in your Booklet-Certificate upon the Employer's request." PRU 459 (emphasis added).

The Employer Plan Document states, in part, on its second page:

> This booklet is intended to provide a summary of the major provisions of certain benefit plans in which you may be eligible to participate. Your benefits are described as clearly as possible with minimal use of the technical words and phrases appearing in the legal plan documents. *However, the official documents and insurance contracts remain the final authority and, in the event of a conflict with this booklet, will govern in all cases.*

PRU 467 (emphasis added). Later, the Employer Plan Document contains the following language under the header "Standard of Review" in reference to "Disability, Life and AD&D Appeals Procedures":

> Prudential will have full discretion and authority to determine questions concerning the interpretation or administration of the life, AD&D, business travel accident and LTD benefits under the plan, including, without limitation, all questions relating to eligibility for these plan benefits. Prudential has discretionary authority to grant or deny benefits under the plan. The determination of Prudential will be conclusive and binding regarding all persons for all

---

[3] As discussed below, Plaintiff claims that the Employer Plan Document "clearly states that it is not part of the legal plan documents and that the official documents and insurance contracts remain the final authority." Plaintiff's Statement of Disputed Facts, D.E. 36-1. Defendant, on the other hand, argues that the Employer Plan Document is part of the binding Plan documents. Def. Br. at 5-8.

purposes. SBHCS has full discretion and authority with respect to
all other benefits under the plan.

PRU 579.

Plaintiff's Claim and Defendant's Denial

On March 2, 2013, Plaintiff submitted a disability claim indicating that she could not work

as of February 26, 2013 due to a "panic disorder." PRU 004, 247. Plaintiff applied for long-term

disability benefits pursuant to the Plan. PRU 220. In order to claim benefits, a person must be

disabled through her elimination period—which is "a period of continuous disability which must

be satisfied before you are eligible to receive benefits from Prudential." PRU 247. Plaintiff's

elimination period specific to her claim was March 2, 2013 through August 28, 2013. PRU 247.

In support of her claim, Plaintiff submitted medical records from Stress Care of New

Jersey, LLC. The records included office notes from both psychiatrist Dr. Manfred Obi, M.D.,

and therapist Laurie Wisotsky. PRU 064-094. On March 2, 2013, Plaintiff had an initial

psychiatric assessment with Dr. Obi in which she complained of "anxiety," and Dr. Obi noted that

the Plaintiff had a reported history of "[p]anic attacks, palpitation, difficulty in breathing, feeling

of freight [sic], impaired memory. Also [Plaintiff] has a lot of [a]nxiety, lump in the throat and

sweaty palm. Patient is sad, irritable, forgetfulness [sic], enhedonia [sic] and feeling of

hopelessness." PRU 091. Dr. Obi diagnosed Plaintiff as follows: "AXIS I: PANIC DISORDER;

AXIS IB: ADD; AXIS III: None; AXIS IV: ECONOMIC PROBLEMS." PRU 092.[4] Dr. Obi

prescribed Plaintiff Sertraline, Concerta, and Clonazepam. PRU 093.

---

[4] The Court assumes that axis diagnoses are pursuant to DSM-5, or the *Diagnostic and Statistical Manual of Mental Disorders*, 5th Edition. In the same report, Dr. Obi reports that Plaintiff had a current Global Assessment of Functioning ("GAF") score of 55, which indicates moderate symptoms.

Plaintiff returned to Dr. Obi a number of times in 2013. On March 8, Dr. Obi noted that Plaintiff "is feeling the same. Still having anxiety but focusing better." PRU 090. On March 16, Dr. Obi indicated that Plaintiff was "still feeling depressed and [a]nxiety. No motivation, poor appetite. Low energy." PRU 088. Dr. Obi also noted that Plaintiff's mood was "[e]uphoric." PRU 088. On March 30, Dr. Obi stated that Plaintiff "is feeling sad with some anxiety" and her mood as "[s]ad. [a]nxious." PRU 087. On April 13, 2013, Dr. Obi noted that Plaintiff was "reluctant to take care of self." ORU 085. Dr. Obi further indicated that Plaintiff did *not* have psychiatric symptoms of anxiety, depression, manic/hypomanic mood, sleep difficulty, obsessions, changes in appetite, or changes in weight; Plaintiff also did *not* report neurological symptoms of memory difficulty, speech difficulty, headaches, and changes in weight. PRU 85. On May 10, Dr. Obi wrote that Plaintiff "is feeling tired and sad. Patient is feeling anxious and cries alot [sic]." PRU 082. Plaintiff's mood was noted as "euphoric." PRU 083. On May 20, Dr. Obi noted that Plaintiff complained of "anxiety episodes" and "feeling overwhelme[d]." PRU 80. Plaintiff also reported psychiatric symptoms of anxiety, depression, sleep difficulty, and weight loss, as well as neurological symptoms of short term memory impairment. PRU 080. Dr. Obi noted Plaintiff's mood as sad and anxious. PRU 081.

Plaintiff further saw Dr. Obi on June 7, July 5, July 19, August 2, August 16, September 13, September 30, and October 22. In all of these appointments, Dr. Obi found that Plaintiff did *not* report any of the listed psychiatric or neurological symptoms—including anxiety, depression, manic/hypomanic mood, sleep difficulty, obsessions, changes in appetite, memory difficulty, speech difficulty, headaches, or seizures—except for Plaintiff's report of short term memory impairment and weight loss on May 20, 2013. PRU 062-079. Dr. Obi's reports also state that Plaintiff's mental status examination—which looks at factors including Plaintiff's appearance,

grooming, behavior, psychomotor, speech, form of thought, insight, and judgment—was always

unremarkable in all categories except for "mood" and "affect." PRU 062-079. Plaintiff's observed

mood on each of those respective visits was euthymic except for March 2 and 8, when it was

"anxious" and "irritable, PRU 090-091, on May 20, when it was "sad" and "anxious," PRU 081,

and on August 16, when it was "sad," "anxious," and "irritable," PRU 070. An euthymic mood is

normal and non-depressed. Plaintiff's "affect" was observed to be "appropriate" in all reports,

except on October 22, 2013, when Plaintiff's affect was observed to be "inappropriate." PRU 065.

On a Prudential "Mental Status Examination Form" completed by Dr. Obi on November

19, 2013, he stated that "Claimant not ready to return to work. Claimant will need limited hours

if she does return in the future." PRU 099. Dr. Obi also stated that "returning to work is not

feasible at this time. Claimant's anxiety needs to be managed." PRU 100. However, in reaching

his conclusion, Dr. Obi does *not* examine the specific duties and responsibilities of an operating

room nurse.

As noted, Plaintiff also saw therapist Laurie Wisotsky. In her psychotherapy progress note

dated October 29, 2013, Wisotsky noted that Plaintiff discussed stress due to her grandfather's

health and the ending of a personal relationship. Wisotsky further indicated that she and Plaintiff

"discussed [Plaintiff]'s tendency to pull away from stress and to not allow herself to feel emotions

associated with the stress she is facing. [Plaintiff] has been finding ways to focus on herself and

to spend time with friends." PRU 094. On July 29, 2014, Wisotsky stated that Plaintiff's

> anxiety has been very difficult to cope with and has caused
> [Plaintiff] to be unable to work. She has been having many
> problems with her memory and is unable to focus on daily tasks.
> [Plaintiff] becomes emotional at times as well. She continues to
> work through issues from her past which have had a significant
> impact on her current ability to function.

PRU 160.

First Determination

On November 22, 2013, Defendant notified Plaintiff in a letter signed by Disability Claims Manager Stefan Schuster that it had completed a review of her claim and determined that she was not entitled to benefits. PRU 220-225. In the denial letter, Defendant provided a "Summary of Medical Information Reviewed" in which Defendant detailed the numerous medical examinations and treatments provided to Plaintiff. PRU 222-224. The letter then stated the following in its "Summary" section:

> After reviewing all the available medical information, it fails to provide compelling evidence and exam data that consistently describes functional impairments of sufficient intensity and severity as to preclude you from working. There are basic mental status examination findings listed on a recent disability form suggestive of some memory and calculation difficulties, however *these are not extensive tests of cognition and lack validity measures*. As outlined above, the majority of the mental status examines documented in Dr. Obi's actual office visit records were essentially normal/unremarkable which most often presenting with good appearance, good grooming, cooperative calm behavior, normal psychomotor, normal speech, euthymic mood, appropriate affect, logical thought, oriented in all spheres and good insight and judgment and no delusions/hallucinations.

> While Dr. Obi recently filled out a disability form offering the opinion that you remain unable to work until anxiety can be managed, the majority of actual office visit records lack compelling evidence of serious functional impairment. Therefore, we have determined that the information in your file *does not support impairment that would prevent you from performing material and substantial duties of your regular occupation*. After a thorough evaluation of the information in your file, we have determined that you do not meet the definition of disability as defined above. Therefore, we have denied your claim.

PRU 224 (emphases added).

First Appeal

On January 17, 2014, Defendant acknowledged Plaintiff's request for a reconsideration of her claim. PRU 227-228. In the notification letter, Defendant stated that it had requested all therapy notes from Wisotsky but only received the October 29, 2013 note. *Id.* Defendant therefore indicated to Plaintiff that "you will need to complete the attached authorization and return it to us by January 27, 2014. We will then request the actual notes." PRU 228. On March 12, 2014, Defendant notified Plaintiff that it received the requested records from Wisotsky. PRU 234. Dr. Jessica Chaudhary, M.D., a physician board certified in clinical neuropsychology, conducted an independent review for Defendant. PRU 150-156, 247. Dr. Chaudhary submitted her findings to Defendant in a report dated March 26, 2014. PRU 150-156. Dr. Chaudhary found, in part, that Plaintiff's "subjective reports of anxiety, panic attacks, inability to concentrate, sleep and memory loss are not consistent with the documentation provided." PRU 153. Dr. Chaudhary concluded, in part, as follows:

> There is no evidence to suggest Ms. Alzza is unable to work given that she is able to care for others and make decisions for others, as noted in her ability to care for her uncle and grandfather. While she is noted to have mild memory and attention issues they are not severe enough to preclude employment. Her mental status exam throughout record review consistently demonstrates appropriate insight/judgment, appropriate affect and unremarkable review of both neurological and psychiatric symptoms. She is also on an appropriate medication regimen, and when combined with therapy, this is an effective treatment for symptoms of depression, anxiety and attention deficit.

PRU 155.

On April 1, 2014, Defendant notified Plaintiff that it had completed the review of Plaintiff's request for reconsideration and stated: "We have determined our decision was appropriate and have upheld our decision to disallow your claim for LTD [long-term disability] benefits." PRU

235. The letter further detailed the reasons for the upholding of Defendant's prior determination. PRU 236-238.

<u>Second Appeal</u>

On August 13, 2014, Defendant notified Plaintiff that it had received her second appeal regarding her claim. PRU 240. Plaintiff also submitted additional medical records, including evaluations by Stephen Craig, Ph.D., and medical records from neurologist Haodong Song, M.D. PRU 161-174, 175-185.

Craig completed a "Cognitive & Memory Evaluation" in which he described Plaintiff's condition based on a number of scales and measures.[5] PRU 161-174. In sum, Craig stated that while on some tests, Plaintiff performed satisfactorily, "Ms. Alzza evidenced significant deficits on virtually all aspects of verbal and non-verbal memory as measured by the TOMAL-2." PRU 173. As such, Craig concluded that "in addition to the presence of broad based anxiety (ICD-9 300.02, 300.2) and an apparent clinically significant level of inattention (as well as hyperactivity/impulsivity) (ICD-9 314.01), I believe that there is also a separate and distinct memory impairment present (ICD-9 780.93)." PRU 174.

Song found that on the Global Cognitive Score, Plaintiff scored more than one standard deviation below average in "memory," "executive function," "attention," and "information processing speed." PRU 179-180. Song also stated that Plaintiff scored below average in "verbal function" and "motor skills" and above average in "visual special." PRU 180. Overall, Song states

---

[5] Craig's report includes a clinical interview/patient history and describes Plaintiff's place on a number of tests and scales including the Wechsler Adult Intelligence Scale (4th edition), the Test of Memory and Learning (2nd edition), the Beery-Buktenica Developmental Test of Visual Motor Integration (5th edition), the Connors Adult AD/HD Rating Scale, the Attention Deficit Disorder Evaluation Scale (Adult Form—Self-Report Version), the Brief Symptom Inventory, and the Million Clinical Multiaxial Inventory (3rd edition).

that Plaintiff's Global Cognitive Score is more than one standard deviation below average. PRU 180.

Prudential had the second appeal independently reviewed by licensed psychologist Rebecca Goodman, Ph.D. Goodman concluded, in part, that

> It is reasonable to conclude, based on these records, that Ms. Alzza had full-time sustained work capacity as of February 26, 2013. She had worked until that time, and there is no evidence of new condition that might explain her becoming unable to work. There is no credible evidence of functional impairment in these records.

PRU 209.

On October 15, 2014, Defendant notified Plaintiff that it had, again, "determined that our decision was appropriate and have upheld our decision to disallow your claim for LTD benefits." PRU 246. The letter stated, in part:

> After reviewing your entire claim, we have determined that there is no impairing condition or restrictions/limitations to preclude you from performing the material and substantial duties of your occupation as a Nurse continuously throughout the elimination period and beyond. The records lack evidence of any kind of significant functional impairment. While there are noted to be symptoms of depression, anxiety, and some mild difficulties with memory, these are not functionally impairing. There is no evidence to suggest significant cognitive disruption. We have determined that the information in your file does not support impairment that would prevent you from performing material and substantial duties of your regular occupation. As a result, we have upheld our decision to deny your claim for LTD benefits. This decision is final and cannot be appealed further to Prudential. If you still disagree with the above decision, you may file a lawsuit under the Employee Retirement Income Security Act (ERISA). ERISA allows you to file suit for policy benefits and reasonable attorney's fees.

PRU 249.

On July 2, 2015, Plaintiff filed a Complaint pursuant to ERISA. D.E. 1. Both parties have now moved for summary judgment, D.E. 32, 33, and each has submitted her/its respective opposition, D.E. 36, 37, and replies, D.E. 38, 39.

## II.    LEGAL STANDARDS

### A.    Summary Judgment Standard

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts

showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51. The standard does not change when parties file cross-motions for summary judgment. When ruling on cross-motions, "the court must consider the motions independently, and view the evidence on each motion in the light most favorable to the party opposing the motion." *Morro v. DBMG Casino LLC*, 112 F. Supp. 3d 260, 276 (D.N.J. 2015) (internal citations omitted).

**B.      Standard of Review in an ERISA Denial of Benefits Claim**

The Court has jurisdiction over this ERISA matter pursuant to 29 U.S.C. § 1132(a)(1)(B). The parties dispute the appropriate standard of review. Usually, "decisions are presumptively reviewed *de novo* . . . [but will] be reviewed for abuse of discretion where the Plan has granted discretionary decision-making authority." *Ho v. Goldman Sachs & Co. Grp. Long Term Disability Plan*, No. 2:13-CV-6104-KM-MAH, 2016 WL 8673067, at *5 (D.N.J. Oct. 28, 2016); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("[A] denial of benefits challenged under [§ 502(a)(1)(B)] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits

or to construe the terms of the plan." (brackets in original)). Plaintiff argues that the Court should review Prudential's determination *de novo* because "it is unclear from the plan documents whether the plan grants such discretionary authority to the plan administrator." Pl. Br. at 14. Defendant argues that an abuse of discretion standard (also referred to as an "arbitrary and capricious" standard) applies because "the Plan documents expressly and uniformly grant Prudential the discretion to make claim determinations." Def. Br. at 6.

The Court must first determine which documents are considered part of the Plan, and then determine whether the Plan's documents grant to Prudential the discretion that it claims. The parties focus on the following language: (1) "proof of continuing disability, *satisfactory to Prudential*" from the Booklet, and (2) "Prudential will have full discretion and authority to determine questions concerning the interpretation or administration of the . . . LTD benefits under the plan" in the Employment Plan Document and other similar language. Prudential heavily relies on the language in the Employment Plan Document.

The Court first finds that the Booklet's language stating that Defendant may request that Plaintiff "send proof of continuing disability, *satisfactory to Prudential*, indicating that [Plaintiff] is under the regular care of a doctor," is not enough, standing alone, to warrant the deferential standard of review. *See Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 417 (3d Cir. 2011) (observing that "no single phrase such as 'satisfactory to us' is likely to convey enough information to permit an insured to distinguish between plans that do and plans that do not confer discretion on the administrator." (quotations and brackets omitted)); *see also Diaz v. Prudential Insurance Co. of America*, 424 F.3d 635 (7th Cir. 2005); *Ho*, 2016 WL 8673067, at *7;.

As to the Employer Plan Document, Prudential points to the following language

> Prudential will have full discretion and authority to determine
> questions concerning the interpretation or administration of the life,

> AD&D, business travel accident and LTD benefits under the plan, including, without limitation, all questions relating to eligibility for these plan benefits. Prudential has discretionary authority to grant or deny benefits under the plan. The determination of Prudential will be conclusive and binding regarding all persons for all purposes. SBHCS has full discretion and authority with respect to all other benefits under the plan.

PRU 579. Plaintiff responds that the Employer Plan Document is not part of the Plan's documents.

In support, Plaintiff points to the following language in the Employer Plan Document:

> This booklet is intended to provide a summary of the major provisions of certain benefit plans in which you may be eligible to participate. Your benefits are described as clearly as possible with minimal use of the technical words and phrases appearing in the legal plan documents. *However, the official documents and insurance contracts remain the final authority and, in the event of a conflict with this booklet, will govern in all cases.*

PRU 567 (emphasis added).

Generally, courts suggest that summary plan descriptions are not necessarily considered a legally enforceable plan document. *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) (holding "that the summary documents, important as they are, provide communication with beneficiaries about the plan, but that their statements do not themselves constitute the terms of the plan for purposes of § 502(a)(1)(B)."); *cf. Ho*, 2016 WL 8673067, at *9 (summarizing that "courts have agreed that *Amara* poses no automatic bar to a written instrument's express incorporation of terms contained in a summary plan description."). In reviewing the scope of *Amara*, Judge McNulty recently engaged in a "case-specific analysis" and looked to *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1131 (10th Cir. 2011), in deciding whether a summary plan description was incorporated into a plan's documents. *Ho*, 2016 WL 8673067, at *9. According to Judge McNulty, the *Eugene S.* court held that *Amara* stood for the propositions that: "(1) the terms of the SPD [summary plan descriptions] are not enforceable when they conflict with

governing plan documents, or (2) the SPD cannot create terms that are not also authorized by, or reflected in, governing plan documents." *Ho*, 2016 WL 8673067, at *9 (quoting *Eugene S.*, 663 F.3d at 1131). Essentially, Judge McNulty found that when the language in the underlying plan documents conflicts with the language in an employer plan document, the underlying plan document controls.

Here, the Employer Plan Document does *not* state that it is explicitly part of the Plan. To the contrary, it expressly states that "the official documents and insurance contracts remain the final authority and, in the event of a conflict with this booklet, will govern in all cases." PRU 467. The Plan's lack of strong discretionary language is in direct conflict with the absolute discretion articulated in the Employer Plan Document.[6] Prudential cites to no language that indicates that the Employer Plan Document is incorporated into the Plan documents or that some aspects of the Plan are set out in separate documents. Importantly, although neither party brings it to the Court's attention, the following language is included in the Booklet: "The Summary Plan Description is *not part* of the Group Insurance Certificate. It has been provided by your Employer and included in your Booklet-Certificate upon the Employer's request." PRU 459; *see Ho*, 2016 WL 8673067, at *9 (finding that identical language "explicitly disclaims incorporation in the Plan"); *Khan v. Prudential Ins. Co. of Am.*, No. CIV.A. 08-2292(SDW), 2010 WL 1286030, at *4 (D.N.J. Mar. 31, 2010). Therefore, because the Employer Plan Document is not controlling, because the Employer Plan Document has an express waiver, and because the Group Contract and Booklet do

---

[6] By way of example, assume that the opposite were true. If the underlying plan contract and summary (here, the Booklet) granted the administrator full discretion, but the employer sponsor released a summary (here the Employer Plan Document) indicating that the administrator did not have such discretion, the administrator would nevertheless have full discretion pursuant to the actual contract and the summary of the contract.

not confer discretionary authority to Defendant, the Court reviews Defendant's determination *de novo*.[7] *See, e.g., Schwartz v. Prudential Ins. Co. of Am.*, 450 F.3d 697, 699 (7th Cir. 2006).

### a. *De Novo* Standard of Review

When a court exercises *de novo* review over an administrator's denial of claimed benefits, the court must "determine whether the administrator . . . made a correct decision." *Viera*, 642 F.3d at 413 (internal citation omitted). "The administrator's decision is accorded no deference or presumption of correctness. The court must review the record and determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Id.* at 413–14 (internal quotations and citations omitted); *Khan*, 2010 WL 1286030, at *6 ("[B]ecause we are conducting a *de novo* review, we examined the evidence that was before Prudential as well as the evidence provided in support of the Motions for Summary Judgment.").

Finally, in reviewing a denial of benefits claim, a court should consider both structural and procedural concerns. *Uqdah v. Unum Life Ins. Co. of Am.*, No. 14-6367, 2015 WL 5572678, at *6 (D.N.J. Sept. 21, 2015) (citing *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525-26 (3d Cir. 2009)). A structural inquiry "focuses on the financial incentives created by the way the plan is organized, i.e., whether there is a conflict of interest" and a procedural inquiry addresses "how the administrator treated the particular claimant." *Miller*, 632 F.3d at 845 (internal quotation marks omitted) (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007)). Plaintiff does not claim that there was a procedural problem and instead argues that there is a structural conflict of interest. *See* Pl. Reply at 8-9.

---

[7] Defendant points to *Fleisher v. Standard Ins. Co.*, 679 F.3d 116 (3d Cir. 2012) and *Osborne v. Aetna*, 2013 WL 3168657 (D.N.J. June 20, 2013) in support of their argument that Defendant deserves an arbitrary and capricious standard of review. However, in both *Fleisher* and *Osborne*, the court found that language *in the plan documents* granted the defendant discretion. Here, however, the Court finds that the language Defendant points to is *not* part of the Plan.

## III.  ANALYSIS

### A. Structural Conflict of Interest

As an initial matter, there is a presumed structural conflict of interest where, as here, the insurance company both reviews claims and pays out benefits. *Estate of Schwing*, 562 F.3d at 526. "The existence of a conflict of interest, however, is not dispositive." *Uqday*, 2015 WL 5572678, at * 6 (quoting *Estate of Schwing*, 562 F.3d at 525-27). Instead, the fact that a conflict of interest exists is just one factor of many that a court must consider when determining whether the administrator improperly denied a claim. *Estate of Schwing*, 562 F.3d at 525-26 ("[B]enefits determinations arise in many different contexts and circumstances, and, therefore, the factors to be considered will be varied and case-specific."). Here, while noting the conflict, Plaintiff fails to point to any facts suggesting that the inherent structural conflict had a direct impact on Defendant's decision to deny her long-term disability benefits. In addition, Defendant hired independent reviewers to examine Plaintiff's administrative file on her first and second appeals. *See Muccino v. Long Term Disability Plan for Choices Eligible Emps. of Johnson & Johnson*, No. 11-3641, 2012 WL 2119152, at *10 (D.N.J. June 11, 2012) (stating that the "[a]dditional potential for structural conflict of interest is further mitigated when . . . the employer hires a third-party to administer the plan") (citing *Pinto v. Reliance Standard Life Ins.*, 214 F.3d 377, 383 (3d Cir. 2000). Accordingly, the Court is aware of the potential for a structural conflict of interest in this case, and considers it as one factor in its analysis.

### B. *De Novo* Review of Defendant's Denial of Plaintiff's Claim

Turning to the *de novo* review of Defendant's denial of Plaintiff's LTD claim, Plaintiff makes a number of arguments why Defendant's determination should not be upheld.[8] The Court takes each argument in turn.

First, Plaintiff argues that Defendants used the wrong standard in examining her claim. Instead of determining whether Plaintiff's claimed condition "impairs her ability to perform the substantial and material functions of her specific job," Plaintiff argues that Defendant examined whether Plaintiff's condition "significantly impair[s] her functioning." Pl. Br. at 20. Plaintiff continues that the relevant "criterion is not whether Ms. Alzza could work generally but rather could she perform the substantial duties of her own occupation." Pl. Reply at 2. Defendant responds that its decision was based on the medical reports provided to it, and that "the results of the objective testing [described in Plaintiff's medical records] undermine any claim that she had a functional impairment that precluded her from working in her own job." Def. Opp. at 15.

It is clear that Defendant is required to conduct its review of Plaintiff's claim in light of the material and substantial duties of her regular occupation. Thus, Plaintiff correctly notes that the issue was not her functional capacity vis-à-vis any potential job that she could perform. The Booklet states, in part:

> You are disabled when Prudential determines that:
> - you are unable to perform the material and substantial duties
>   of your *regular occupation* due to sickness or injury . . .
>
> . . .
>
> Material and substantial duties means duties that:

---

[8] The Court notes that Defendant accurately describes the burden of proof in the claims process. Under the Plan, Plaintiff bears the burden of providing evidence that she is eligible to receive benefits under the Plan. While Defendant must consider the evidence that Plaintiff provides, the burden is on Plaintiff to provide sufficient evidence to sustain the claim.

- are normally required for the performance of your *regular occupation*; and
- cannot be reasonably omitted or modified.

*Regular occupation means* the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

PRU 330 (emphases added). The Court focuses its inquiry on whether Defendant evaluated Plaintiff's claims in light of the duties "normally required for the performance of [her] regular occupation," PRU 330, that is, as an operating room nurse.

Plaintiff does point to some language in which the Defendant uses "functional impairment" to examine Plaintiff's condition. However, the Court finds that Defendant ultimately used the correct standard when determining that Plaintiff's claim does not "support impairment that would prevent [her] from performing material and substantial duties of your regular occupation." PRU 249 (Second Appeal Determination). For example, in Defendant's letter to Plaintiff describing the reasons for its denial of her second appeal, Defendant devotes a paragraph to describing the tasks involved in Plaintiff's occupation as an operating room nurse. Defendant indicated as follows:

Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location. You are a Registered Nurse. The job description provided by your employer indicates that your job requires general nursing care to patients in a hospital and operating room. Medications are prescribed as well as treatments in accordance with approved nursing techniques. You are required to prepare equipment and aids [sic] physician during treatments and examinations of patients. You are required to observe patients, record significant conditions and reactions, and notify supervisors or physicians regarding the patient's condition and reaction to drugs, treatments, and significant incidents. You are also expected to takes [sic] temperature, pulse, blood pressure, and other vital signs to detect deviations from normal and assess condition of patient.

PRU 249. Defendant then added the following:

After reviewing your claim, we have determined there is no impairing condition or restrictions/limitations to preclude you from performing the material and substantial duties of your occupation as a Nurse continuously throughout the elimination period and beyond. . . . We have determined that the information in your file does not support impairment that would prevent you from performing material and substantial duties of your regular occupation. As a result, we have upheld our decision to deny your claim for LTD benefits.

PRU 249.

The Court finds that Defendant examined Plaintiff's claim under the correct standard: whether Plaintiff was unable to perform the material and substantial duties of her regular occupation due to sickness or injury. While Defendant also referenced functional impairment, *see, e.g.*, PRU 249, this is not a case in which Defendant ignored the requirements of Plaintiff's regular occupation. Instead, Defendant clearly set forth Plaintiff's regular occupation (and Plaintiff does not contest Defendant's recitation) and analyzed Plaintiff's claimed disability in light of that occupation.

Plaintiff next argues that Defendant's determination was inconsistent with the medical evidence. Pl. Br. at 19-25. The Court finds that Defendant's reviewers examined all of Plaintiff's medical evidence and considered the evidence in a manner consistent with the Plan. While it is true that Plaintiff's health professionals opined that Plaintiff could not work, Defendant's reviewers reasonably found these opinions inconsistent with the underlying medical records. For example, Dr. Obi stated on November 19, 2013 that "Claimant not ready to return to work. Claimant will need limited hours if she does return in the future." PRU 099. Dr. Obi also stated that "returning to work is not feasible at this time. Claimant's anxiety needs to be managed." PRU 100. However, as noted by Defendant, Dr. Obi fails to explain why Plaintiff could not return to work, Def. Opp. at 10, and also consistently noted underlying symptoms that were unremarkable.

Importantly, Dr. Obi fails to discuss the requirements of Plaintiff's regular occupation and why Plaintiff's impairment prevent her from working.

Defendant's reviewers considered Dr. Obi's opinion, but concluded that the underlying symptoms did not support his conclusion that Plaintiff could not return to work. PRU 152, 257-258, 205. For example, Dr. Chaudhary, the independent reviewer on Plaintiff's first appeal, found as follows:

> There are numerous inconsistencies in the record between the subjective report from the claimant and the objective evaluation by Dr. Obi. The majority of the objective reporting from Dr. Obi beginning with the intake notes from 3/2/13 reveals an unremarkable review of systems [sic], normal affect, euthymic mood and appropriate insight and judgment.

PRU 152. Dr. Goodman, the independent reviewer on Plaintiff's second appeal, similarly found that "there are numerous inconsistencies in the record between the claimant's subjective report and the objective evaluation by Dr. Obi." PRU 205. On July 29, 2014, Therapist Laurie Wisotsky and Psychiatrist Lyubov Shkarupa noted that Plaintiff's "anxiety has been very difficult to cope with and has caused [Plaintiff] to be unable to work. She has been having many problems with her memory and is unable to focus on daily tasks." PRU 160. However, the administrative record shows that Defendant's reviewers similarly found this opinion inconsistent with the underlying information. For example, Dr. Chaudhary stated that "[t]he ability to make decisions and care for another is not consistent with an impairing psychological condition." PRU 154. Dr. Goodman concurred. PRU 205 ("The majority of the observations by Dr. Obi and Ms. Wisotsky suggests no evidence of functional impairment.").

In conducting a *de novo* review, the Court agrees with Defendant's assessment. Plaintiff's subjective complaints to her healthcare professionals were inconsistent with their objective findings. As noted, Plaintiff was often found to have a euthymic mood. In addition, Plaintiff was

consistently found to have a good appearance, good grooming, cooperative calm behavior, normal psychomotor, normal speech, appropriate affect, logical thought, orientation in all spheres, good insight and judgment, and no delusions or hallucinations. Plaintiff was also able to help care for a family member. Moreover, and critically, Plaintiff's medical professionals failed to analyze Plaintiff's limitation in light of the duties of her regular occupation.

The Court also finds that Defendant's reviewer on Plaintiff's second appeal thoroughly examined the opinions and observations of Dr. Song and Dr. Craig.[9] Dr. Goodman found that while scores on the Brief Symptom Inventory test administered by Dr. Craig "suggest anxiety and obsessive-compulsive symptoms . . . this test does not have symptom validity indicators with which to verify the credibility of scores." PRU 207. Importantly, when Defendant denied Plaintiff's initial claim, it put her on notice that she her submission lacked not only testing but testing with "validity measures." PRU 224. Dr. Goodman also observed that "[t]he Million Clinical Multiaxial Inventory-III (MCMI-III) has symptom validity scales, and Ms. Alzza's scores were within normal limits on those." PRU 207. In short, Dr. Goodman found that there was enough to "raise doubts about the credibility of Ms. Alzza's self-report." PRU 207. Following a *de novo* review of the record, the Court agrees with Defendant's assessment.[10]

In sum, the Court finds that Plaintiff fails to raise any genuine issue of material fact regarding Defendant's determinations in its initial denial of Plaintiff's claim, or in its denial of

---

[9] Plaintiff provided the additional medical information from Dr. Song and Dr. Craig on her second appeal. DSOMF at ¶ 73. Accordingly, only Dr. Goodman examined these records.

[10] Plaintiff also briefly argues that Defendant failed to have Plaintiff "evaluated by a physician of their choosing to confirm or contradict the opinions of those treating physicians." Pl. Br. at 22. However, the Plan does not require Defendant to conduct an Independent Medical Exam ("IME"). Rather, the Plan states that Defendant "may require [a claimant] to be examined by doctors, other medical practitioners or vocational experts" of their choice. PRU 330. Accordingly, Defendant was under no obligation to conduct an independent exam of Plaintiff.

Plaintiff's first and second appeals. Therefore, Defendant's motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied.

### C. Attorneys' Fees

Plaintiff contends that pursuant to Section 1132(g)(1), she is entitled to recover reasonable attorneys' fee and costs in this action. Pl. Br. at 26. "Pursuant to that statute, the defendant in an ERISA action usually bears the burden of attorney's fees for the prevailing plaintiff." *Brytus v. Spang & Co.*, 203 F.3d 238, 242 (3d Cir. 2000). However, because Plaintiff is not the prevailing party, she is not entitled to an award of attorneys' fees or costs.

## IV. CONCLUSION

For the foregoing reasons and for good cause shown, Plaintiff's motion for summary judgment (D.E. 32) is **DENIED**, and Defendant's Cross-Motion for Summary Judgment (D.E. 33) is **GRANTED**. An appropriate form of Order accompanies this opinion.

Dated: February 7, 2018

John Michael Vazquez, U.S.D.J.